UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:16CR163RWS(SPM) |
| | ) | |
| OSCAR HENRY STEINMETZ, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter was referred to the undersigned United States Magistrate Judge for all pretrial

matters pursuant to 28 U.S.C. §636(b). Defendant Oscar Henry Steinmetz ("Steinmetz") is

charged in an indictment with production of child pornography in violation of 18 U.S.C.

§2251(a). Incriminating evidence was seized from Steinmetz's residence on May 1, 2015, during

a warrantless search conducted by officers from the Maryland Heights Police Department.

Steinmetz filed a motion to suppress evidence contending the search was not consensual. Doc.

36. The United States contends the search was consensual. *See* Doc. 40.

On January 12, 2017, the undersigned held an Evidentiary Hearing at which defendant

appeared with counsel. Detective Kendra House testified on behalf of the United States and was

cross examined at length by defense counsel. Both sides asked the Court to consider a video-

taped statement given by Steinmetz on May 1, 2015, and photographs taken by Detective House

during the search in support of their respective positions. *See* Govt. Exs. 4, 6, & 7. The United

States also presented documentary evidence in the form of a written statement of constitutional

rights and waiver form executed by Steinmetz (Govt. Ex. 1), a consent to search form executed

by Steinmetz (Govt. Ex. 2), a permission to search seized items form executed by Steinmetz (Govt. Ex. 3), transcripts of certain portions of the interview of Steinmetz (Govt. Ex. 5), and specific photographs taken during the course of the search (Govt. Exs. 8 & 9).

Based on the written submissions and oral argument of the parties, the evidence presented, and my review of the applicable law, I make the following findings of fact and conclusions of law.

## I.    FACTUAL FINDINGS

On April 22, 2015, E.S., a twenty-eight year old woman,[1] went into the Maryland Heights Police Department and made a complaint about sexual abuse she allegedly suffered when she was a minor. Detective Kendra House ("Det. House") is a seventeen-year veteran with the Maryland Heights Police Department. Det. House has extensive training and experience handling and investigating major sex crimes involving children and child exploitation. Although Det. House was not present when E.S. made her initial complaint, the case was referred to her; and, on April 27, 2015, she reviewed the file and interviewed E.S.

E.S. told Det. House that between the ages of thirteen and sixteen, she was sexually molested by Steinmetz, who was her stepfather at the time. E.S. provided Det. House with a detailed description of when, where, and how the abuse began and the manner in which it escalated over time. Specifically, E.S. told Det. House that the abuse started under the auspices of a head massage that progressed to abuse that included, among other things, sodomy, flogging, and bondage. She said that some of the abuse occurred while she and Steinmetz watched pornographic Japanese animé, some of the abuse involved her wearing bondage-related costumes, and some of the abuse was photographed. According to E.S., the abuse finally stopped

---

[1] Det. House testified that E.S. was undergoing a sex change at the time she made the complaint to police.

after her mother saw Steinmetz coming out of E.S.'s bedroom one night in the nude. Det. House also interviewed E.S.'s mother, Steinmetz's ex-wife.

Based on her interview of E.S. and her mother, Det. House decided to attempt a consensual interview of Steinmetz and to attempt to get him to consent to a search of the residence. On May 1, 2015, Det. House went with another detective to the school where Steinmetz worked as a school bus driver and asked him if he would be willing to accompany them back to the police station to answer questions. By that time, Steinmetz was already aware that E.S. had made the complaint to police. He agreed to be interviewed and accompanied the officers back to the police station after first being permitted to retrieve an item he left on the school bus. He traveled with the officers to the station in their unmarked police car and was restrained only by his seatbelt which he fastened himself. There was no show of force by the officers nor were any threats or promises made to Steinmetz before he was interviewed.

Once at the police station, Steinmetz was taken into an interview room where he was questioned separately by Det. House and her supervisor, Sergeant White ("Sgt. White"). The interview began around 11 a.m. and lasted (with intermittent breaks) until approximately 5 p.m. Steinmetz was taken into custody following the interview. Before beginning the interview, Det. House advised Steinmetz of his rights by reading them from a rights form. Steinmetz acknowledged both verbally and in writing that he understood his rights, and then he signed the section of the form entitled "Waiver" in which he acknowledged that he understood his rights and was willing to answer questions. *See* Govt. Ex. 1. Det. House then questioned Steinmetz for approximately one hour before asking for his consent to search his residence. When Steinmetz suggested at one point that he wanted a lawyer, Det. House immediately stopped questioning him until he explicitly stated that he was willing to continue talking to her without a lawyer. For the

duration of the interview, Steinmetz appears on video to be relatively at ease and calm. Det. House testified that, based on her interactions with him, Steinmetz appeared to be a man of above-average intelligence particularly in light of his knowledge of computers. The videotaped interview supports that conclusion.

In the hour before asking Steinmetz for consent to search his house, Det. House asked Steinmetz about the allegations made by E.S. Steinmetz acknowledged that he had given E.S. a massage on her neck and shoulders in connection with migraine headaches but denied any abuse. He also admitted that one night, at approximately 2 a.m., his wife saw him leaving E.S.'s room when he was wearing only his underwear. He stated his wife asked him why he was in E.S.'s room; he also stated that his wife also spoke to E.S. and, at that point, she chose to believe him that all he did was massage E.S. Steinmetz denied that he was nude when his wife saw him leaving E.S.'s room; denied that E.S. ever wore or used any master/slave bondage costumes or sex toys; denied showing E.S. any pornographic Japanese animé; and denied taking nude photos of E.S. or ever being nude in front of E.S.

About an hour into the interview, notwithstanding his statements to the contrary, Det. House told Steinmetz she didn't think there was any reason for E.S. and her mother to lie and that she believed their version of events. At approximately 12:14 p.m., Det. House asked Steinmetz if he would have a problem with allowing her to look at his computer and hard drives and thumb drives to verify that he did not have any naked pictures of E.S. and never took any. Steinmetz indicated that he would be okay with that. Det. House further explained that she has a "forensic group" that she uses who could look at computers, hard drives, thumb drives, cameras, etc. and recover deleted items of child pornography. Det. House also asked Steinmetz if he'd be willing to sign a consent form to permit her forensic group to look at his computer, hard drives,

media, cameras, etc. to confirm Steinmetz's statements that he never abused E.S. or took pornographic photographs of her. Steinmetz told Det. House where in the house he kept his computers, cameras, media, and other items and indicated that he'd be okay if those items were "sent off to be examined."

At 12:18 p.m., Det. House handed Steinmetz a consent to search form which he can be seen reading on the video. Det. House then explained that the form would allow police to search the entire house; Steinmetz appears to read along and is seen on video signing the spaces where it indicated his signature or initials were required. *See* Govt. Ex. 2. When Det. House asked Steinmetz if he would be okay with officers going over to his house to begin the search, Steinmetz said he'd rather be there if he could. Det. House then asked if Steinmetz had any sensitive or work-related information stored on his computer and he indicated that he did not.

Det. House spent the next hour trying, unsuccessfully, to get Steinmetz to acknowledge that all or part of what E.S. and her mother reported might be true. The discussion between Steinmetz and Det. House became tense when Det. House used profanity while pressing Steinmetz to admit that E.S. and her mother were not lying. Steinmetz became defensive and accused Det. House of being "on their side;" however, he did not withdraw his consent for the search. At approximately 1:30 p.m., Det. House left Steinmetz alone in the interview room. Other than returning briefly to bring Steinmetz a bottle of water and a sac meal, Det. House left Steinmetz alone in the interview room for about one hour.

When Det. House returned to the interview room, she confronted Steinmetz with additional information she obtained from a childhood friend of E.S. Det. House asserted that the friend's information further corroborated the claims made by E.S. and her mother. Det. House told him that, based on the information she had collected so far, she "knew" something happened

between Steinmetz and E.S. Det. House, again, attempted to persuade Steinmetz to acknowledge the truth of all or part of what E.S. and her mother reported – to no avail.

At 2:44 p.m. Sgt. White went into the interview room and, for nearly forty-five minutes, attempted to get Steinmetz to make incriminating statements. Specifically, White told Steinmetz that, based on the information they'd gathered, the police believed the events as described by E.S., her mother, and the childhood friend. Sgt. White explained that police were simply trying to give Steinmetz an opportunity to explain the context in which the molestation occurred. Sgt. White also suggested that Steinmetz might get "help" if he acknowledged he needed help and that Steinmetz "can't get hurt by the truth." Sgt. White also suggested that the investigation would not stop and that police would do "more digging" if Steinmetz did not admit to molesting E.S. Sgt. White also suggested that if Steinmetz confessed, showed remorse, and asked for help he was more likely to have leniency from a prosecutor, judge, and/or jury. Steinmetz did not make any incriminating statements or otherwise confess but he also did not withdraw his consent to the search of his residence and computers.

At about 3:28 p.m. Sgt. White advised that he did not think he was going to hold Steinmetz but, based on Steinmetz's agreement that officers could search his house and take his computers, officers were going to go to his house and conduct the search while Steinmetz "sits tight" at the station. When Steinmetz asked "so, I won't be able to be there when they get the computer?" Sgt. White answered "no" and went on to reassure Steinmetz that his officers would not take anything they did not "deem of evidentiary value." Sgt. White told Steinmetz that officers would conduct a limited search of his residence and further explained that he would personally oversee the search and officers would only remove computers and related items from his home. During that discussion, it was clear that Steinmetz understood that officers were going

to remove computers and related items from his home and examine them at a later time.

Sgt. White further tried to assure Steinmetz that the officers would be discreet, to which Steinmetz responded that his neighbor was already aware that police might go to his home as he was previously aware of E.S.'s complaint and had told his neighbor he might be picked up. Although it was clear at that point that Steinmetz was not going to be allowed to accompany police to his house or to be present during the search, he did not insist on accompanying the officers; nor did Steinmetz withdraw his consent or indicate that his consent had been predicated on his presence during the search.

At about 3:42 p.m., Sgt. White presented Steinmetz with a consent form for the search of any computers seized from his residence. *See* Govt. Ex. 2. Sgt. White asked Steinmetz if the computers were password protected. Steinmetz answered White's questions and volunteered that the computers were accessible and then signed the consent form. After he executed the consent form, Steinmetz was permitted to leave the interview room to use the restroom.

Officers searched Steinmetz's home between approximately 4 p.m. and 5 p.m. They documented what they seized and observed with over one hundred photographs. *See* Govt. Ex. 7. Officers seized multiple computers, external hard drives, memory sticks, hundreds of anime DVDs, homemade DVDs, and a camera among other things. In the interim, between approximately 4:35 p.m. and 5 p.m., Sgt. White attempted intermittently to persuade Steinmetz to make an incriminating statement. Although the exchange between Steinmetz and Sgt. White occasionally became tense, both men remained primarily calm and measured. Sgt. White neither threatened Steinmetz nor promised him anything in exchange for his consent or a statement. In fact, Sgt. White and, later, Det. House declined to accept an incriminating statement from Steinmetz in exchange for reassurance that he would be released.

At no time either prior to, or during the search did Steinmetz express to Sgt. White or anyone else that he wanted to withdraw his consent or limit it in any way. Indeed, after Steinmetz signed the consent to search the computer and after it was clear that Steinmetz would not be permitted to accompany the officers on the search, Det. House asked Steinmetz which of his keys opened the door to his residence. Not only did Steinmetz tell her which key opened the door, he also told her which door the family typically used to enter the residence.

## II.   CONCLUSIONS OF LAW

The Fourth Amendment protects individuals from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. For a search to be reasonable, the government generally must obtain a warrant supported by probable cause before "physically intruding on constitutionally protected areas" or otherwise searching areas or items in which an individual has a reasonable expectation of privacy. *Florida v. Jardines*, 569 U.S. ——, ——, 133 S.Ct. 1409, 1417, 185 L.Ed.2d 495 (2013). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573 U.S. ——, ——, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014).

A search that is conducted pursuant to consent is "one of the specifically established exceptions to the requirements of both a warrant and probable cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *accord Fernandez v. California*, 571 U.S. ——, ——, 134 S.Ct. 1126, 1132, 188 L.Ed.2d 25 (2014) ("It would be unreasonable—indeed, absurd—to require police officers to obtain a warrant when the sole owner or occupant of a house or apartment voluntarily consents to a search."). "Consent to search ... may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the [area or] item to be searched." *United States v. Wolff,* 830 F.3d 755, 758 (8th Cir. 2016) (quoting *United States v. James*, 353 F.3d 606, 613 (8th Cir. 2003)). The court must consider the totality of the

circumstances in determining whether consent was voluntary including the individual's personal characteristics such as age and mental ability as well as "the environment in which an individual's consent is obtained including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent, (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search." *United States v. Dunning,* 666 F.3d 1158, 1165 (8th Cir. 2012) (quoting *United States v. Quintero,* 648 F.3d 660, 667 (8th Cir. 2011)). "[A]n officer's credible report of verbal consent can suffice to meet the government's burden of establishing consent" despite conflicting or contradictory evidence from the defense. *Wolff,* 830 F.3d at 758 (quoting *United States v. Harper,* 787 F.3d 910, 914 (8th Cir. 2015) (per curiam)).

In this case, to meet its burden of establishing consent to search, the United States presented testimony from Det. House, written consent forms signed by Steinmetz, and a videotaped interview of Steinmetz. The testimony of Det. House was credible and consistent with the videotaped interview of Steinmetz. In the videotaped interview, Steinmetz clearly and unambiguously consented to a search of his residence, computers, and other media that store electronic information. Consent for the search was given during the course of a consensual interview that lasted roughly six hours. Nothing occurred during the course of the interview to suggest that Steinmetz's will was overborn by the officers.

Steinmetz himself appeared to be an articulate, intelligent, man in his early sixties. Throughout the interview, with one or two brief exceptions, neither Steinmetz nor any of the officers raised their voices. Steinmetz appeared to be relatively at ease, was provided with lunch, and was permitted to leave the interview room to use the restroom when he requested. Although

Steinmetz stated that he'd "prefer" to be present when officers searched his residence, he did not condition consent on his presence for the search and did not revoke his consent when he learned that the search would be conducted without him. In sum, the testimony of Det. House, coupled with Steinmetz's statements, my observations of his interactions with the officers in his videotaped interview, and the written consents he executed, all support the United States' assertion that the search and seizure were consensual.

Although Steinmetz certainly had a right to testify in support of his motion to suppress, *see Simmons v. United States,* 390 U.S. 377, 394 (1968) ("[W]hen a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt"), he did not do so. Nor did Steinmetz present any other witness or evidence to contradict or otherwise rebut the evidence of his consent which included Det. House's testimony, the written consent forms, and Steinemtz's statements and body language during the videotaped interview. Instead, Steinmetz challenges the voluntariness of his consent by advancing two arguments that lack merit.

First, Steinmetz argues that the length of the interrogation rendered his consent involuntary. Although the length of an interrogation is a factor that could impact the court's determination of voluntariness, *see Dunning,* 666 F.3d at 1165, in this case, the length of the interrogation did not render Steinmetz's consent involuntary. As the United States pointed out in its brief and during oral argument, although Steinmetz was interviewed for approximately six hours, he verbally consented to the search within the first hour and a half after the interview began. He did so after being advised of his *Miranda* rights and after Detective House described in some detail what officers, including forensic experts, would be searching for on his computer. At no point prior to Steinmetz's oral consent was he threatened, verbally or physically abused, or made any false

promises. Although officers continued to talk to Steinmetz in the nearly four hours that elapsed between the time he verbally consented to the search and the actual search, Steinmetz never wavered on the verbal consent he initially gave. Instead, he documented his oral consent by signing two separate forms granting officers written permission to search his residence and any computers and other media found there.

Steinmetz's second argument – that his consent was limited and conditional – is also unavailing. "Where a suspect provides general consent to search, only an act clearly inconsistent with the search, an unambiguous statement, or a combination of both will limit the consent." *United States v. Beckmann,* 786 F.3d 672, 679 (8th Cir. 2015)(citing *United States v. Lopez–Mendoza,* 601 F.3d 861, 867 (8th Cir.2010)). A suspect's "subtle indication that [he] wishes to limit the scope of a search is insufficient to render the search unreasonable." *Id.*

As the foregoing factual findings demonstrate, Steinmetz gave a general consent (both verbally and in writing) to a search of his residence and specifically consented to a search of his computers, external hard drives and other storage media. Steinmetz told the officers that he would "prefer" to be present during the search but did not condition consent on his presence during the search. In fact, *after* it was already clear to him that he would not be accompanying the officers, Steinmetz documented his verbal consent to the search of his computers by signing the permission to search form. Steinmetz also told Det. House which key to use to enter his residence *after* it was clear that he would not be allowed to be present for the search. In sum, the evidence as a whole supports the conclusion that the search conducted was within the scope of Steinmetz's consent.

For all of the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence (Doc. 36) be **DENIED.**

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set before the **<u>Honorable Rodney W. Sippel</u>** on **<u>April 3, 2017, at 9 a.m.</u>**


_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of February, 2017.